# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ELIZABETH R., | ) |
| Plaintiff, | ) No. 19 cv 1215 |
| v. | ) Magistrate Judge Susan E. Cox |
| ANDREW M. SAUL, Commissioner of the Social Security Administration[1], | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Elizabeth R.[2] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. Plaintiff has filed a motion for summary judgment [dkt. 11]; the Commissioner has filed a cross-motion for summary judgment [dkt. 15]. As detailed below, Plaintiff's motion for summary judgment [dkt. 11] is DENIED and the Commissioner's motion for summary judgment [dkt. 15] is GRANTED.

**I.    Background**

    **a.    Procedural History**

Plaintiff applied for Disability Insurance Benefits on June 10, 2015, alleging a disability onset date of July 1, 2014. [Administrative Record ("R.") 193-196]. Plaintiff's claim was denied initially and again upon reconsideration. [R. 30.] Following these denials, Plaintiff appeared at a November 16, 2017 Administrative Hearing before Administrative Law Judge ("ALJ") Cynthia M. Bretthauer. [R. 49-77.] On November 16, 2017, ALJ Bretthauer issued an unfavorable decision. [R 30-40.] Plaintiff requested and was denied Appeals Council review [R. 1-4], thus making the Decision of the Appeals

---

[1]    As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

Council the final decision of the Commissioner. Plaintiff filed the instant action on February 18, 2019, seeking review of the Commissioner's decision. [Dkt. 1.]

b. **Relevant Background**

Plaintiff was born in 1959 and was 55 years old on her alleged disability onset date. [R. 193.] Plaintiff has an MBA and was the owner of a cosmetology school for twenty-two years. [R. 985-86.] She also had prior employment as an assistant manager in retail, as well as a few short jobs in grocery stores. [R. 986.]

Plaintiff was diagnosed with atrial fibrillation on May 24, 2014, after she presented to the emergency room with heart palpitations. [R. 323.] A chest x-ray indicated tachycardia, and cardiac enlargement was noted compared to ten years prior. *Id.* Physicians determined Plaintiff's palpitations were a result of atrial fibrillation, and she was admitted and started on medication. [R. 315-16.] Plaintiff was experiencing a fast heart rate, lasting for one or two hours. [R. 317.] She was given medication and chemically converted to normal sinus rhythm. [R. 318.] On June 2, 2014, Plaintiff again experienced palpitations which eventually became flutters, and she underwent a cardiology consultation with Dr. Ronald Berger, M.D, who thereafter became her treating cardiologist. [R. 463.] She was admitted to the hospital and discharged the following day. [R. 431.] One day later, she again presented at the emergency room with similar symptoms, and was found to be in atrial fibrillation. [R. 389, 431.] She was chemically converted to normal sinus rhythm. [R. 389.] She returned on June 12, 2014, also in atrial fibrillation. *Id.* She was provided additional prescription medications and scheduled for cardioversion. [R. 393-94.] In September 2014, Plaintiff again presented at the emergency room with similar atrial fibrillation symptoms and was chemically converted to normal sinus rhythm. [R. 491.]

In October 2014, Plaintiff underwent her first ablation procedure because her atrial fibrillation failed to be controlled by medications. [R. 595-97.] In January 2015, it was noted that she appeared to

have a good response to the ablation. [R. 841.] In April 2015, Plaintiff's physician noted that while Plaintiff's atrial flutter "had gone from persistent/permanent to paroxysmal and much less frequent and bothersome," he cautioned that the condition was not "cured" and offered Plaintiff three choices: watchful waiting, anti-arrhythmic medication, or a repeat ablation. [R. 836.] Plaintiff opted for observation at that point because she felt "too well" for any therapeutic interventions. *Id.* In March 2016, although medication suppressed her atrial fibrillation, she experienced atrial fibrillation symptoms when she was noncompliant with the medication (the record notes Plaintiff "could not easily afford it"). [R. 1200-02.] These flutters resolved spontaneously after AV nodal blockers, and Plaintiff chose to restart medication rather than undergo another ablation because the medication was effective. [R. 1199-1202.] However, it appears the medication may have stopped being effective at some point thereafter, as records indicate Plaintiff was having quite a bit of atrial fibrillation and flutter despite medication. [R. 1206.] Therefore, in July 2016, Plaintiff underwent a second, extensive ablation procedure. *Id.*

On October 12, 2017, after several asymptomatic months, Plaintiff presented to her cardiologist with atrial fibrillation, elevated blood pressure, and dyslipidemia. [R. 1233.] Dr. Berger noted that normal sinus rhythm had resumed, noted that Plaintiff was able to exercise up to 4 METs without symptoms (and did, in fact, report using the elliptical for 30 minutes and the treadmill for 60 minutes five times a week), and recommended that Plaintiff follow up with him in one year. [R. 1233-39.] On October 25, 2017, a note from Dr. Berger appears in the file indicating that "[Plaintiff] should be able to take breaks for high blood pressure symptoms when needed." [R. 1413.]

    c.    **The ALJ's Decision**

On January 30, 2018, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 30-40.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 1, 2014 through her date last insured. [R. 32.] At Step Two, the

ALJ found that Plaintiff had the severe impairments of atrial fibrillation, status-post ablations, dysphonia, and bipolar disorder. [R. 33.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 33-35.]

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[3] to perform light work with the following limitations: she may lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently; she can sit for six to eight hours and stand and/or walk at least six hours in an eight-hour workday; she can frequently climb stairs and ramps; she can never climb ladders, ropes or scaffolds; she should avoid concentrated exposure to open heights and moving and hazardous machinery; she is limited to simple and detailed, one-to-five step instructions; and she can communicate orally on a frequent, but not constant, basis. [R. 35.]

At Step Four, the ALJ found Plaintiff capable of performing her past relevant work as a food sales clerk (DOT# 290.477-018, heavy as performed, SVP-3); or assistant manager (salesperson) (DOT# 261.357-066, heavy as performed, SVP-5 as performed). [R. 39.] At Step Five, the ALJ made an alternative finding that Plaintiff was capable of performing other jobs existing in significant numbers in the national economy, including customer order clerk (DOT #249.362-026); receptionist (DOT #237.367-038); and customer service clerk (DOT #299.367-010). [R. 39-40.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 40.]

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe

---

[3]    RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

4

impairment; and (3) whether the severe impairment (or, in this case, the combination of impairments) meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 404.1523; 20 C.F.R. § 404.1545; 20 C.F.R. § 416.920(a)(4)(i)-(v). While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. S.S.R. 96-8p, 1996 WL 374184, *5 (July 2, 1996). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."

5

*Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

### III. Discussion

Plaintiff contends there are several problems with the ALJ's opinion: (1) the ALJ allegedly failed to account for Plaintiff's limitations in combination with each other; (2) the ALJ allegedly undermined Plaintiff's credibility; (3) the ALJ allegedly ignored one specific opinion of Dr. Berger, one of Plaintiff's treating physicians; and (4) the ALJ allegedly relied on unreliable VE testimony. The Court disagrees with each of these contentions, and addresses each in turn.

#### a. Combination of Impairments

Plaintiff argues that the ALJ failed to consider her mental impairments in combination with her severe physical impairments in determining her RFC. Specifically, Plaintiff notes that "her fear of the next episode [of atrial fibrillation] is, in and of itself, incapacitating" and "her anxiety about the possibility of experiencing an episode [is] the reason for her deficits," thus prohibiting her from understanding, remembering, or applying information on a *sustained* basis. [Dkt. 11, pp. 10-11 (emphasis in original).]

Ultimately, this bleak picture of self-reported incapacitation by anxiety is not supported by the medical record. An ALJ's evaluation of a claimant's symptom allegations is entitled to special deference, and it will be overturned only if it is "patently wrong," *i.e.*, when it "lacks any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Here, the Court finds the ALJ adequately addressed Plaintiff's anxiety to the extent

6

the medical records did support it; based on her analysis of the medical record, instead of relying wholesale on Plaintiff's testimony at the Administrative Hearing, the ALJ incorporated into Plaintiff's RFC five-step instructional limitations. The Court finds the ALJ adequately considered Plaintiff's activities to discount her testimony concerning any anxiety that might have needed to be considered in combination with other impairments.

In her discussion of Plaintiff's limitations, the ALJ found that Plaintiff "limited her social activities because she never knew when she might experience atrial fibrillation," but noted that Plaintiff occasionally went out to dinner and the movies, and had recently visited Montana, Austin, Texas, and Costa Rica. [R. 34.] The ALJ noted that Plaintiff was able to drive, and shop frequently. [*Id.*] She was "able to perform all house and yard chores" when not experiencing atrial fibrillation symptoms.[*Id.*] With regards to concentration, persistence, and pace, the ALJ noted that Plaintiff "had no problems following written or verbal instructions when not experiencing [atrial fibrillation] symptoms" but that Plaintiff stated she was unable to pay attention when experiencing those symptoms. [*Id.*]

The medical records regarding Plaintiff's anxiety also corroborate the ALJ's observation that Plaintiff was not limited by her anxiety concerning atrial fibrillation, but only by actual episodes of atrial fibrillation. Several May 2014 records indicate that Plaintiff had a short history of mild anxiety: Plaintiff's history included "ANXIETY x 1 Months;" "[s]he does have mild anxiety disorder." [R. 317; 336-337; *see also* 431 ("mild anxiety").] June 2014 records indicate Plaintiff's history of "anxiety [stems] from the death of 5 family members from different medical conditions all within about 2 months (ten years ago, not recovered yet)" [R. 417 (parenthetical in original).] She reported trouble sleeping "only *during* AF (atrial fibrillation)." [R. 374 (emphasis added).] In October 2017 (after her second ablation), Plaintiff reported to her psychiatrist that "she will feel her heart go into a fib, and her anxiety will increase and she will panic." [R. 1388.] The consulting psychologist's notes state that Plaintiff "indicates that because of her heart issues, that mood issues are triggered by her health status," and

further, that "[o]n occasion, she may skip activities of daily living, but this is more initially related to physical rather than emotional difficulties." [R. 986-87.] Plaintiff reported to her physician in June, 2014 that she used to exercise regularly but her divorce lessened the frequency of her exercise. [R. 417.] In November, 2017 she testified at the Administrative Hearing that she had, a few months prior, been going to the gym 5-6 nights a week until this routine was derailed by her son's revelation he was an alcoholic and his subsequent move home. [R. 65.]

Additionally, as recognized by the ALJ, although Plaintiff claimed in her disability application (dated July 15, 2015) she experienced atrial fibrillation five days a week, this statement was made after her first ablation procedure but before her second (July 2016), and at the Administrative Hearing the Plaintiff testified she had experienced only one episode of cardiac fluttering (not even a full blown atrial fibrillation episode) in the prior year. [R.36.] In fact, Plaintiff's medical records appear to only reflect a single episode where she reported to a physician that she was anxious about potentially experiencing atrial fibrillation, and the physician specifically "reassured her that as long as her rate is controlled and she takes her [medication] she is protected," and this reassurance was "comforting to her." [R. 394.]

There is little evidence that Plaintiff experiences five episodes of atrial fibrillation five days a week as she claims, or that she experiences a crippling anxiety that causes self-limiting behavior as a result of fear of an atrial fibrillation episode, such that would be prohibited from understanding, remembering, or applying information on a sustained basis. It is not an error for the ALJ to have concluded the same. Therefore, it is similarly not erroneous for the ALJ to have not accounted for these alleged limitations in combination with each other. The Court declines to remand on this basis.

b. **Plaintiff's Credibility**

Next, Plaintiff alleges the ALJ "impermissibly undermined Plaintiff's credibility with improper inferences and leaps of logic." [Dkt. 11, p. 7.] An ALJ's credibility determination is afforded

8

"considerable deference" on review and may only be overturned if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). An ALJ's credibility finding can only be reversed if it is rooted "in an observation or argument that is unreasonable or unsupported" by the record. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir 2009) (in order to uphold a credibility determination, ALJ must give specific reasons supported by substantial evidence).

The notion that the ALJ herself could undermine Plaintiff's credibility is nonsensical, and the Court does not find that she did. Rather, the ALJ noted a number of factors which the ALJ found undermined Plaintiff's credibility. The Court does not find the ALJ's analysis of these factors patently wrong, and thus, declines to remand on this basis.

The Court has already discussed Plaintiff's atrial fibrillation claims, *supra*, Section III(a). Inherent in that discussion are the reasons the ALJ discounted Plaintiff's credibility based on the assertion she experiences atrial fibrillation five days a week. The Court does not find the ALJ's conclusion unsupported by the record on this point or patently wrong.

Plaintiff also takes issue with the ALJ's rejection of Plaintiff's assertions of constant crying. The ALJ noted that Plaintiff "alleged that she cried continually throughout the day, every day" but also noted that this was undermined by the fact that she has not required any inpatient or intensive outpatient therapy such as a day program, nor had any therapist suggested Plaintiff require more than one therapy visit every three weeks. [R. 36.] Moreover, the Court finds that many of the other activities of daily living detailed by the ALJ undermine Plaintiff's allegations of nonstop crying, such as going to the gym, driving a car three times a week, shopping frequently, performance of all house and yard chores while not in atrial fibrillation, and trips to other states and other countries. [R. 34, 36, 38.] While there is one record of Plaintiff establishing care with a new psychiatrist that indicates Plaintiff "cried throughout interview," the results of that visit were continuation/slight change in Plaintiff's

medications and recommended counseling, with a follow-up appointment in four weeks [R. 1388, 1397]; the Court does not find that this singular visit greatly contradicts the reasons for the ALJ's rejection of Plaintiff's assertions about the severity of her crying. The Court does not find the ALJ's analysis of Plaintiff's crying to be unsupported by the record or patently wrong.

The Court finds the ALJ properly considered Plaintiff's description of her activities of daily living in assessing whether her testimony about the effects of her atrial or mental impairments were credible or exaggerated. In fact, it is the ALJ's job to note inconsistencies in these areas when she finds a claimant less than credible, as this is a key part of building a logical bridge from the ALJ's reasoning to her conclusions. The ALJ concluded that, when viewed together, Plaintiff's ability to work previously,[4] her non-rigorous psychological therapy regimen,[5] and her daily activities, all undermined Plaintiff's credibility when describing her disability. "These are exactly the type of factors the ALJ was required to consider." *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir.2013). The Court finds the ALJ's explanations sufficient to reasonably conclude, as the ALJ did, Plaintiff exaggerated the effects of her impairments. *Id.* Because the ALJ provided specific reasons for her credibility finding, which the Court does not find to be patently wrong, this finding is supported by substantial evidence and will not be overturned.

Lastly, Plaintiff states the ALJ "badgered" Plaintiff at the administrative hearing when the ALJ inquired why Plaintiff did not seek out a mental health professional for the allegedly debilitating mental health symptoms she described during the hearing (*e.g.*, difficulty getting out of bed, inability to find happiness in anything, difficulty being social, crying) [R. 61-62]. However, this is of no import, as it

---

[4] This includes, but is not limited to, the fact Plaintiff's "earnings records support that she was able to work with…mood swings throughout most of her life." [R. 37.]

[5] Here the Court references the ALJ's notation that Plaintiff has not required any inpatient or intensive outpatient therapy such as a day program, nor had any therapist suggested Plaintiff require more than one therapy visit every three weeks. [R. 36.] The Court in no way means (nor does it believe) the ALJ considered Plaintiff's decision not to seek dedicated mental health treatment as indicative of a non-rigorous therapy regimen.

was not part of the ALJ's decision. The Court's role is to review the ALJ's decision, and this exceedingly brief (and valid) three-question inquiry into Plaintiff's reasoning behind not seeking a dedicated mental health professional sooner instead of relying solely on her primary care doctor is not mentioned in the ALJ's decision, either directly or obliquely. The ALJ's decision merely notes that Plaintiff "saw only her primary care physician for psychotropic medication until she saw a psychiatrist for the first time in April 2017."[6] [R. 37.] The ALJ's decision also mentions the mental health treatment Plaintiff ultimately received [R. 36], and in no way maligns her for not seeking out this treatment earlier. The Court declines to remand on this basis.

    c.    **Opinion of Dr. Berger**

Plaintiff next claims the ALJ improperly ignored the opinion of Plaintiff's treating cardiologist that Plaintiff would require breaks throughout the day. The entirety of Dr. Berger's opinion is as follows: "[Plaintiff] should be able to take breaks for high blood pressure symptoms when needed." [R. 1413.] The ALJ addressed this opinion thusly:

> The undersigned gave some consideration to Dr. Berger's October 2017 note that the claimant requires some breaks when experiencing symptoms but notes that the record reflects that the claimant has experienced such symptoms infrequently and not for some time. In addition, the statement does not support additional limitations and is generally consistent with the functional capacity assessment defined herein.

[R. 38 (record citation omitted).]

As an initial matter, Plaintiff is simply incorrect that the ALJ ignored this opinion of Dr. Berger. Next, Plaintiff fails to cite to any evidence to rebut the ALJ's conclusion about the infrequency of

---

[6] Plaintiff also argues that "[t]he mere fact she was being treated with psychotropic medication indicates Plaintiff's mental impairments were far more limiting than the ALJ suggested." [Dkt. 11, p. 15 (citing *Plessinger v. Berryhill*, 900 F.3d 909 (7th Cir. 2018).] However, the Court does not find the corroboration between physical pain and prescription narcotics dealt with in *Plessinger* analogous to the situation at hand. As the Commissioner notes, "[P]laintiff has not attempted to show a parallel between mental impairments and medication, nor is the Commissioner aware of one. Narcotics are a unique category of medication without a commonly recognized psychotropic equivalent." [Dkt. 16, p.7.] The Court finds this rationale persuasive and decline to accept Plaintiff's attempt, without further support, to analogize her case to *Plessinger*.

Plaintiff's symptoms.[7] A party is responsible for making its own case, and the Court will not scour the record to make arguments in support of Plaintiff's disability. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("[w]e will not scour a record to locate evidence supporting a party's legal argument."); *Herrmann v. Astrue*, 2010 WL 356233, at *13 (N.D. Ill. Feb. 1, 2010) (same in a Social Security context) (citing *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1135 (7th Cir.1997)). Given Plaintiff's inability to rebut the ALJ's specific findings, there is no reason to believe remand on this point would produce a different result. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (explaining an error is harmless if the court "can predict with great confidence that the result on remand would be the same"). Therefore, the Court declines to remand on this basis.

### d. VE Testimony

Finally, Plaintiff claims the ALJ's findings were based on unreliable VE testimony. Specifically, Plaintiff takes issues with the fact the VE testified that Plaintiff performed her past jobs at an exertional level greater than indicated in the DOT.

This distinction made by the VE raises no red flags in the Court's mind, particularly since Plaintiff was performing the jobs at a *heavier* exertional level than the DOT classification (*i.e.*, most of the available jobs with a food sales clerk or manager/assistant manager/salesperson title would be of a light exertional level commensurate with the DOT and, thus, Plaintiff would be able to perform these jobs as they are generally performed under the RFC set by the ALJ, rather than her past exertional level). *See e.g.*, *Gillen v. Colvin*, 2016 WL 233099, at *2 (N.D. Ill. Jan. 20, 2016) (at the exertion level in RCF, claimant could still perform past relevant work, "but as listed in the DOT, not as performed.") In fact, the Court has seen numerous cases where the VE makes a distinction between

---

[7] In fact, the reality that this single-sentence opinion of Dr. Berger, seemingly unconnected to any office visit, was written less than two weeks after Plaintiff's prior visit to Dr. Berger, where he noted that Plaintiff was able to exercise up to 4 METs without symptoms (and did, in fact, report using the elliptical for 30 minutes and the treadmill for 60 minutes five times a week), supports the ALJ's rationale for only giving this note some consideration.

the exertional level in the DOT for past relevant work and the exertional level of the same position as actually performed by the claimant.[8] Plaintiff has cited no case law holding that this is a cause for remand. Similarly, the Court is unaware of a scenario where the exertional level changes the DOT code for a particular job, as Plaintiff seems to imply when she suggests "the DOT classifications are likely incorrect" because of this exertional level discrepancy. [Dkt. 11, p. 16.] This is neither a reason for the ALJ to have treated the VE's job classification testimony as suspect nor a reason for remand, and the Court declines to do so on this basis.

Plaintiff also argues "[t]he alternative jobs proposed by the VE are, quite simply absurd" because it is "inconceivable" Plaintiff would be able to handle the interaction/conversation with others in these positions. [Dkt. 11, p. 17.] However, the Court notes the ALJ accommodated Plaintiff's dysphonia (a condition the ALJ noted caused a soft, raspy voice which led to some difficulty communicating by telephone but does not cause any pain [R. 36]) in the RFC when she limited Plaintiff to "communicating orally on a frequent, but not constant basis."[9] [R. 35.] According to the Social

---

[8] In the Northern District of Illinois alone, *see e.g.*, *Lynette C. v. Saul*, 2019 WL 5420081, at *4 (N.D. Ill. Oct. 23, 2019) (home health nurse job medium per DOT, light as performed); *Ronald W. v. Saul*, 2019 WL 3889625, at *5 (N.D. Ill. Aug. 19, 2019) (sheet metal worker job medium per DOT, heavy as performed); *Gwendolyn M. v. Berryhill*, 2019 WL 2208306, at *5 (N.D. Ill. May 22, 2019) (mailroom clerk job light per DOT, heavy as performed); *Rose v. Berryhill*, 2018 WL 6590561, at *2 (N.D. Ill. Dec. 14, 2018) (cabinet maker/framer job medium per DOT, heavy as performed); *Serpico v. Berryhill*, 2017 WL 4633214, at *5 (N.D. Ill. Oct. 16, 2017) (construction electrician job medium per DOT, heavy as performed; tavern manager/bar manager job light per DOT, medium as performed); *Turner v. Colvin*, 2016 WL 3088134, at *6 (N.D. Ill. June 2, 2016) (assistant grocery manager job light per DOT, medium as performed); *Matiya v. Colvin*, 2015 WL 764059, at *3 (N.D. Ill. Feb. 23, 2015) (bartender job light per DOT, medium as performed; check-out cashier job light per DOT, heavy as performed); *Peterson v. Colvin*, 2014 WL 4652475, at *9 (N.D. Ill. Sept. 18, 2014) (electrician job medium per DOT, heavy as performed); *Machalinski v. Colvin*, 2013 WL 6069427, at *3 (N.D. Ill. Nov. 18, 2013) (plasterer job medium per DOT, heavy as performed); *Bielefeldt v. Colvin*, 2013 WL 2156058, at *4 (N.D. Ill. May 17, 2013) (office equipment mechanic job light per DOT, medium to heavy as performed); *Firkin v. Astrue*, 2012 WL 1454002, at *2 (N.D. Ill. Apr. 25, 2012) (carpenter job medium per DOT, heavy as performed).

[9] While it appears to the Court Plaintiff likely intended this final section of her brief to argue that Plaintiff's dysphonia would make it difficult to communicate orally on frequent basis, Plaintiff also refers to Plaintiff's "non-exertional deficits" being a similar hinderance. Plaintiff fails to detail which non-exertional limitations might make it "inconceivable" she could perform the alternate jobs identified by the ALJ, or how she might be hindered from such performance. However, the Court does note the ALJ's RFC granted Plaintiff a limitation of no more than five-step instructions even though Plaintiff had an MBA. The Court also notes that the ALJ found Plaintiff would be able to perform her past relevant work, so an analysis of these alternative jobs is of little moment anyhow, and certainly no cause for remand.

Security Administration, the term "frequently" "means that the activity or condition occurs from one-third to two-thirds of an 8-hour workday." Program Operations Manual System, DI 25001.001(A)(33) Medical and Vocational Quick Reference Guide, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001. While Plaintiff alleges the alternative jobs – customer order clerk, customer service clerk, and receptionist – all "involve constant interaction (and conversation) with others," she provides no support for this allegation. In fact, one need only look at the DOT to see all the other job duties associated with each of these positions to realize that these jobs do not require *constant* oral interaction with others, but rather, interaction that is likely closer to one-third to two-thirds of an 8-hour workday.[10] Simply put, it is not inconceivable that an individual who was limited to only frequent oral communication could perform these positions. Additionally, the vocational expert was specifically asked hypotheticals relating to frequent but not constant talking, and indeed thought it conceivable for an individual with Plaintiff's oral limitations to perform these alternative jobs, and her testimony is uncontradicted on this point. Moreover, these are alternative findings made by the ALJ despite the finding that Plaintiff was indeed able to perform her past relevant work and, thus, they have less gravitas in the current discussion. The Court declines to remand on this basis.

---

[10] For example, there are many tasks within the job of customer order clerk (DOT #249.362-026) that do not include oral communication:

> processes orders for material or merchandise…edits orders received…writes or types order form, or enters data into computer…records or files copy of orders received…may check inventory control and notify stock control departments of orders that would deplete stock…may initiate purchase requisitions…may route orders to departments for filling and follow up on orders to ensure delivery by specified dates…may compute price, discount, sales representative's commission, and shipping charges…may recommend type of packing or labeling needed on order…may compile statistics and prepare various reports for management.

The same holds true for customer service clerk (DOT #299.367-010):

> arranges for gift wrapping, monogramming, printing, and fabrication of such items as desk nameplates and rubber stamps, and repair or replacement of defective items covered by warranty…prepares special order worksheet…keeps record of services in progress…issues temporary identification cards…approves customer's checks and provides check cashing service…resolves customer complaints and requests for refunds, exchanges, and adjustments…provides customers with catalogs.

The same also holds true for receptionist to a lesser degree (although the Court has seen nothing indicating the position entails constant oral communication) (DOT #237.367-038):

> may type memos, correspondence, reports, and other documents…may issue visitor's pass…may collect and distribute mail and messages.

## IV. Conclusion

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 11] is DENIED and the Commissioner's motion for summary judgment [dkt. 15] is GRANTED.

Entered: 1/22/2020

Susan E. Cox,
United States Magistrate Judge